UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL BRIODY,

                           **Plaintiff,**

        -against-

COMMISSIONER OF SOCIAL SECURITY,

                        **Defendant.**

---

**18-cv-7006 (ALC)**

**ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Michael Briody (hereinafter, "Plaintiff" or "Mr. Briody") brings this action, *pro se*, challenging the Commissioner of Social Security's decision that Mr. Briody was not disabled for the purposes of entitlement to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (hereinafter, the "Act").

## PROCEDURAL HISTORY

Plaintiff filed a Request to Proceed In Forma Pauperis and a Complaint on August 1, 2018, thus initiating this case. ECF Nos. 1-2. Pursuant to the Standing Order regarding motions for judgment on the pleadings in social security cases, Defendant filed the SSA Administrative Record on November 6, 2018. ECF Nos. 3, 9. Following a brief stay due to the Government shutdown, Defendant filed a Motion for Judgment on the Pleadings on March 14, 2019. ECF Nos. 14-15. On July 10, 2019, Plaintiff filed a Memorandum of Law in Opposition to the Commissioner's Motion along with a Motion in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings. ECF No. 25. Defendant filed a Reply to Plaintiff's Opposition as well as an Opposition to Plaintiff's Cross-Motion on July 31, 2019.

The Cross-Motions are deemed fully briefed. After careful consideration, Plaintiff's Motion is hereby **DENIED** and Defendant's Motion is hereby **GRANTED**.

COPIES MAILED

## I.   Procedural Background

Mr. Briody filed Title II applications for SSI and DBI on or around July 7, 2014. R. at 10. In those applications, Plaintiff alleged that his disability began on December 1, 2010. *Id.* Initially, both applications were denied on November 3, 2014. *Id.* Shortly thereafter, and in accordance with SSA policy, Mr. Briody filed a written request for a hearing. *Id.* A hearing was ultimately held on November 1, 2016. *Id.*

Following the hearing, on October 25, 2017, the Administrative Law Judge determined that Mr. Briody was not disabled under sections 216(i) and 223(d) of the Act, nor was he disabled under section 1614(a)(3)(A) of the Act. R. at 23. On June 21, 2018, the Appeals Council indicated that there was no basis for changing the Administrative Law Judge's decision, thus rendering the October 25, 2017 decision the final decision of the Commissioner of Social Security. *Id.* at 1. As stated, Mr. Briody then filed his Complaint challenging that decision in this Court on August 1, 2018. ECF No. 2.

## II.   Factual Background

### a.   Plaintiff's Background

Mr. Briody was born on June 10, 1970. R. at 22. At the time of his hearing, Mr. Briody lived with his 86-year-old father. *Id.* at 100. Mr. Briody completed high school in 1988 and specialized job training as an electrician in 1989. *Id.* at 73. Plaintiff worked as a lineman for a

---

[1] "R" refers to the Certified Administrative Record. ECF No. 9. Pagination follows the original pagination in the Certified Administrative Record.

fiber optics company from 1995 to 2010, and briefly held a position loading and unloading at a fruit market in 2006. *Id.* at 74. As a lineman, Plaintiff would help install cable lines. *Id.* at 108.

Mr. Briody was forty (40) years old when he allegedly became disabled on December 1, 2010.[2] R. at 73. Since his disability, Mr. Briody "usually stay[s] in [his] own house." *Id.* at 96. When he does go out, he usually walks, but he cannot walk more than a "city block and a half" before he must rest. *Id.* at 96, 128. The only time Plaintiff uses public transportation is when he has a doctor's appointment and his father cannot drive him. *Id.* at 99-100. Mr. Briody stated that he does not do any of the food shopping nor does he do any of the household chores, other than vacuuming his room and occasionally doing his own laundry with the assistance of his father. *Id.* at 96-99, 127-28. Plaintiff seldomly goes for walks with friends, none of which last more than an hour. *Id.* at 96. The vast majority of his walks are to the store to buy beer and cigarettes. *Id.* at 100-101.

Mr. Briody's primary hobbies include watching T.V. and movies. R. at 100. His favorite program on television is "The Price is Right". *Id.* at 131. He does not do any volunteer work or belong to any social groups. *Id.* at 101. Plaintiff does not read, nor does he know how to use computers or the internet. *Id.* at 131. Mr. Briody stated that he has three (3) friends with whom he drinks on a regular basis. *Id.* Plaintiff's friends, family members, and people around the neighborhood give him money for beer. *Id.* at 132. As of the date of the hearing, Plaintiff also had a girlfriend who he had been with for thirteen (13) years. *Id.* at 145. He stated that she would drive him places, such as the time they went apple picking, and they would occasionally go to

---

[2] At his hearing, the Administrative Law Judge examined Mr. Briody, who stated that his disability began in March of 2010. R. at 96.

the movies. *Id.* at 145-46. Plaintiff no longer works, other than a couple of instances where he helped his brother by holding a ladder while his brother worked. *Id.* at 107, 137. Plaintiff receives "a couple of bucks here and there" for his services. *Id.*

### b. Plaintiff's Alleged Disabilities and Symptoms

Plaintiff alleges that he battles with alcohol and drug dependence, anxiety, depression, hepatitis C, hemochromatosis, a debilitating back condition, arthritis and pain in his hands and wrists, epilepsy, seizures, knee and leg pain, a thyroid condition, and difficulty hearing.

Regarding alcohol and drug dependence, Mr. Briody has had a long struggle with trying to maintain sobriety. R. at 101-02. He has visited the emergency room on multiple occasions, all of which have been drug and alcohol related. *Id.* at 120. Plaintiff testified that he would drink between twelve and eighteen beers per day. *Id.* at 100, 105. Plaintiff offered that his reason for drinking was to "kill the pain" in his back and "kill memories" in his mind. *Id.* at 129-30. As for cocaine, on the date of the hearing Mr. Briody claimed that he no longer used cocaine, but had within a couple months of the hearing. *Id.* at 105.

Mr. Briody also testified about the constant anxiety and depression he experiences. R. at 103. He alleged "difficulty being around other people." *Id.* at 119. He feels like he is "impending doom," and that at any moment "someone is going to come up and hit [him] in the back of the head with a baseball bat." *Id.* at 120. Due to his anxiety and depression, Mr. Briody "can't see [himself] functioning around other people," and the medications he takes make him tired. *Id.* at 121-22. Plaintiff's brother, Colm Briody, confirmed Plaintiff's sentiments by stating that Plaintiff is "full of self-centered fear" and is anxious all the time, and that his mental limitations remained, even during the times Plaintiff was sober. *Id.* at 136, 141-43.

4

Mr. Briody and his brother both testified regarding Plaintiff's back injury. R. at 112, 139-40. Plaintiff alleged that he had back problems that caused him to shake and make him "incapable of doing the work" that he did prior to the alleged onset of his disability in December of 2010. *Id.* at 112. He experiences pain on a daily basis that runs through his back and into his legs. *Id.* Plaintiff does not attend physical therapy for his back, nor does he take prescribed pain medication to address the discomfort due to his addictive personality. *Id.* at 113-14.

In addition to the back pain plaguing Mr. Briody, he also discussed the arthritis in his right hand that limits his lifting and grabbing ability. R. at 117-18. Plaintiff states that despite pain in his left wrist due to a prior surgery, the arthritis in his right hand relegates him to the exclusive use of his left hand. *Id.*

In addition to the disabilities and symptoms mentioned above, Plaintiff also discussed his hepatitis C diagnosis, although, as a result of treatment, Plaintiff was free from hepatitis C as of the date of the hearing. R. at 104, 123. Plaintiff also claimed that he has had hemochromatosis since he was a child, and the iron deficiency causes pain in his liver. *Id.* at 104-105, 123. Furthermore, Plaintiff cites to a history of seizures and epilepsy – both conditions which he has been treated for. *Id.* at 122. An old knee injury requiring surgery still causes him pain in his right leg and knee, and "thyroid dysfunction" gives rise to issues with humidity. *Id.* at 123-24. Mr. Briody complains of difficulty hearing because he was "knocked around" as a child, as well as difficulty focusing on tasks. *Id.* at 131-133. In general, Mr. Briody alleged that he is in "severe pain" constantly. *Id.* at 127.

### c. Evidence of Medical Treatment in the Record

#### i. Alcohol and Drug Treatment

Mr. Briody testified to consuming upwards of eighteen (18) beers a day, drinking half a bottle of liquor in a day, and, at times, consuming $300 of cocaine three times a week. R. at 765, 1264, 1527. On multiple occasions over the past few years, Mr. Briody received alcohol treatment, including detoxification care at various facilities. Mr. Briody also received similar treatment for drug use. The manner in which Mr. Briody sought treatment varied – at times it was on his own initiative, and at others he was brought by friends, family, or other actors. R. at 425, 548, 601, 731. Plaintiff displayed and experienced a variety of symptoms during the visits pertaining to substance use, including tremors, shakes, anxiety, irritability, loss of appetite, insomnia, and body aches. *Id.* at 508, 544, 562, 590, 610, 756, 861, 909, 937, 1288, 1317, 1601, 1612.

The Administrative Record indicates substance related hospitalization at various points from January of 2011 to September of 2015. R. at 425, 429, 499-500, 507-10, 548-49, 578-79, 589, 601, 614-15, 644, 662, 691, 756, 937, 942, 863, 908-09, 1023-25, 1206, 1288, 1314, 1317, 1360, 1448-49, 1453, 1527-29. At times during these visits, Mr. Briody's mental status examinations indicated relatively normal mental states. *Id.* at 508-09, 550, 601-02, 614-15, 1319, 1453. At others, Mr. Briody was erratic, anxious, irritable, and demonstrated combative and inappropriate behavior. *Id.* at 544, 562, 579, 589-90, 757, 866.

In January of 2011, Mr. Briody was assaulted while drinking and subsequently admitted to the emergency room ("ER"). R. at 937, 942. He had cuts and scrapes on his face and stated that he was hit with a bat, fists, and bottles. *Id.* at 942. Moreover, the Administrative Record

6

indicates that Mr. Briody was belligerent, agitated, and spoke in a slurred manner. *Id.* at 943. Later that year, Mr. Briody received detox treatment in May, July, August, and October. *Id.* 863, 908-09, 1288, 1314, 1317. At his visit in August, Mr. Briody acknowledge cocaine use in addition to alcohol abuse. *Id.* at 1317.

In January of 2012, Mr. Briody was once again assaulted while drinking. R. at 756. He self-reported having used cocaine, Oxycontin, and Percocet in addition to alcohol. *Id.* Mr. Briody displayed aggressive and combative behavior on admission, and ultimately left before completing treatment. *Id.* at 752, 757. On three separate occasions over the next two months, Plaintiff was stabbed in the chest during another drinking related incident, sought detox treatment complaining of right-hand pain, and was found intoxicated on the street, having a seizure. *Id.* at 425, 429, 731, 1206.

Plaintiff returned for detox treatment in May, July, August, and November of 2012. R. at 644, 662, 691, 1360. In November, Plaintiff underwent a CT scan due to a possible head injury, *but the CT scan came back negative for any internal bleedings or fractures. Id. 1360, 1362. 2013* included detox admissions in March, May, June, and November. *Id.* 589, 601, 614-15, 1023-25. Plaintiff demonstrated a plethora of symptoms including suicidal and homicidal ideation, dizziness, tremors, and anxiety, and "acted strangely" at various points. *Id.* at 450, 589-91, 595. Mr. Briody received further detox treatment in April, June, August, and October of 2014 as well. *Id.* 499-500, 548-49, 578-79, 1527-29. Plaintiff's final two documented instances of substance related treatment came in July and September of 2015 when he was hospitalized due to an injury to his right hand sustained while drinking. *Id.* at 507-10, 1448-49, 1453.

### ii. Mental Treatment

While the documentation of treatment sought for Plaintiff's psychological conditions is not as extensive as it is for Plaintiff's substance related and physical treatment, the Administrative Record indicates that Mr. Briody began seeing Dr. Faiq Hameedi, a psychiatrist, in December of 2014. R. at 1763-66. Plaintiff reported drinking, depression, feelings of guilt and worthlessness, low energy, trouble sleeping, inability to concentrate, lack of motivation, anxiety, paranoia, and a general state of panic. *Id.* After evaluating Plaintiff, Dr. Hameedi indicated that Mr. Briody was alert, anxious and depressed, carried a circumstantial thought process, and had minimal impulse control, among other things. *Id.* at 1766. Mr. Briody had a GAF score of 60, indicating moderate symptoms, and a PHQ-9 score of 13, indicating moderate depression. *Id.* at 1767-68.

Plaintiff returned to Dr. Hameedi in December of 2015 during a period of sobriety. R. at 410. Dr. Hameedi indicated that Plaintiff had improved and that he was only in need of support and/or maintenance. *Id.* Mr. Briody once again posted a GAF score of 60. *Id.* Plaintiff visited Mr. Hameedi multiple times in 2016 and 2017, but the documentation of these visits is sparse. *Id.* at 1759-61, 1755, 1758, 1757, 1759.

### iii. Physical Treatment

#### 1. Back Pain

In March of 2010, Mr. Briody underwent a series of MRIs of his cervical and lumbar spine. R. at 420-23. The resulting images showed a C5/6 small herniation, with mild foraminal narrowing, a L5/S1 herniation, showing extension abutting the right S1 nerve root, a L4/5

herniation, showing displacement of the right L5 nerve root, L3/4 and L2/3 disc bulges, and lumbar and cervical straightening. *Id.*

There are varying accounts relating to additional back treatment Plaintiff may have received. R. at 76, 113, 270, 409, 420, 422, 492. Plaintiff was allegedly evaluated by Dr. Robert Holtzman for back pain, but, despite a subpoena and a request from Plaintiff's attorney, the only documents in the Administrative Record referencing any treatment from Dr. Holtzman are the results of Plaintiff's 2010 spinal MRIs. *Id.* Further, Plaintiff was examined by Dr. Lee Berk who identified a reduced range of motion in the cervical spine, tight hamstrings, and a negative straight leg raising in July 2016. *Id.* at 1013, 1714.

### 2. Knee Pain

In October of 2014, Mr. Briody had x-rays taken of his right knee which indicated no significant abnormality or damage. R. at 497. Dr. Lee Berk also noted patellar crepitance in October of 2014. *Id.* at 1013, 1714.

### 3. Wrist and Hand Pain

There are multiple mentions of wrist and hand injuries, treatments, and pain throughout the Administrative Record.

In January of 2012, after voicing complaints about left wrist pain, Dr. Sam Moghtaderi, an orthopedist observed that Plaintiff had a full range of motion in both wrists and digits and displayed slight tenderness in specific areas. R. at 477-79. Plaintiff was prescribed a wrist brace and anti-inflammatory medication. *Id.*

In June 2014 Plaintiff visited the ER for a right hand and wrist injury after he allegedly fell while drinking. R. at 1405. Plaintiff was diagnosed with a triquetral fracture and soft tissue

swelling, which was almost completely healed by July of the same year. *Id.* at 1418-19, 466, 468.

Further evaluation of Plaintiff's right writs indicated a solid range of motion along with some

tenderness and swelling, the cause of which Dr. Moghtaderi opined stemmed from posttraumatic

arthritis. *Id.* at 475-76. Dr. Moghtaderi suggested the use of a brace and Aleve to address any

pain and swelling. *Id.*

In May of 2016, Dr. Albert Panozzo evaluated Mr. Briody and identified moderate

swelling and tenderness in Plaintiff's right hand, writs and finders, but Plaintiff presented a full

range of motion and no evidence of a more serious condition. R. at 1696-97. Pictures taken by

the doctor indicated that Mr. Briody has arthritis in his right hand. *Id.*

### 4. Epilepsy

In November of 2014, Plaintiff began seeing Dr. Alexis Boro, a neurologist with whom

Plaintiff discussed his history of seizures. R. at 966. Mr. Boro's report indicates that Plaintiff had

his first seizure in 1987 and his last daytime seizure in 2007. *Id.* Mr. Briody also complained of

nighttime seizures resulting in bite marks in his mouth every couple of weeks. *Id.* Dr. Boro

reviewed MRIs and CT scans of Plaintiff's brain, taken over the years, which indicated that Mr.

Briody had encephalomalacia and gliosis. *Id.* During subsequent visits, Mr. Briody informed Dr.

Boro that he remained free of day seizures. *Id.* at 947, 987, 1716, 1720. In June of 2015,

however, Plaintiff indicated that he had resumed drinking and once again started to wake up with

bike marks in his mouth. *Id.* at 987, 1720. Dr. Boro expressed belief that many of Plaintiff's

seizures were alcohol-related. *Id.* at 950, 968.

### 5. Hepatitis C and Hemochromatosis

Mr. Briody also sought treatment for hemochromatosis and hepatitis C from Dr. Kristina Chacko. R. at 951, 970. Plaintiff testified that his hepatitis C was completely treated with medicine. *Id.* at 104, 123.

#### d. Medical Opinions in the Record

##### i. Psychological Evaluation: J. Straussner

On October 27, 2014, Dr. Straussner reviewed Mr. Briody's medical records and determined that Mr. Briody was not disabled. R. at 171. In conducting a Residual Functional Capacity Assessment ("RFC"), Dr. Straussner opined that Plaintiff had moderate physical limitations on lifting and carrying, could stand or sit for the majority of an eight-hour work day, and should avoid even moderate exposure to hazards such as heavy machinery and heights. *Id.* at 166-67. Dr. Straussner identified Mr. Briody's cognitive limitations as moderate in relation to carrying out detailed instructions, working in close proximity with others, and general decision making. *Id.* at 168-69. Regarding appropriate work, Dr. Straussner's ultimate conclusion was that Plaintiff was capable of performing light work involving simple tasks and minimal social interaction. *Id.* at 170.

##### ii. Psychiatric Evaluation: Melissa Antiaris

On October 10, 2014, Dr. Antiaris performed a psychiatric evaluation of Mr. Briody. R. at 486. After a review of Plaintiff's background, medical and psychiatric history, drug and alcohol history, mental status, and mode of living, Dr. Antiaris found that Mr. Briody had "no limitations" in his ability to follow and understand simple instructions and complete simple tasks. *Id.* at 489. She found that Mr. Briody had some difficulty concentrating and performing

complex or new tasks. *Id.* Her review indicated that his ability to make appropriate decisions and deal with the various stressors in his life was "markedly limited." *Id.* Dr. Antiaris also identified Mr. Briody's difficulty in relating to others. *Id.*

Overall, Dr. Antiaris diagnosed with a major depressive disorder, an unspecified impulse control disorder, generalized anxiety disorder, alcohol use disorder, and cocaine use disorder. R. at 489.

### iii. Internal Medicine Evaluation: Julia Kaci

On October 10, 2014, Dr. Kaci performed an internal medicine evaluation on Mr. Briody. R. at 492. Based on a review of Mr. Briody's complaints and medical history, and in conjunction with a physical examination, Dr. Kaci diagnosed Plaintiff with low back pain and a history of lumbar disc herniations, right knee pain, grand mal seizures, chronic hepatitis C, hemochromatosis, and alcoholism. *Id.* at 495. Dr. Kaci further opined that claimant should "avoid drinking, operating machinery, and unprotected heights." *Id.* Plaintiff's "moderate limitations" relate to squatting, kneeling, going down stairs, lifting, and carrying. *Id.* Plaintiff's "mild limitations" relate to bending, sitting, and standing. *Id.*

### iv. Functional Evaluation: Faiq Hameedi

Mr. Briody visited Dr. Hameedi on multiple occasions. After performing a functional evaluation on Mr. Briody, Dr. Hameedi diagnosed Plaintiff with major depression and prescribed Neurontin, Naltrexone, and Depakole. R. at. 1352-58, 1769-20. Dr. Hameedi's evaluation concluded with the assessment that Plaintiff was mildly limited in daily activities, and, if he were to work, he would likely miss there days a month. *Id.* at 1772-74. Further, Dr. Hameedi opined that Mr. Briody displayed moderate limitations in his ability to understand, remember, and carry

12

out instructions, as well as marked limitations in social functioning, responding appropriately to supervision and co-workers, responding to customary work pressure, and performing both simple and complex tasks on a sustained basis. *Id.* Dr. Hameedi stated that Mr. Briody had a GAF score of 65 – an indicator of mild symptoms. *Id.* at 1769. Dr. Hamedi noted that Plaintiff was still drinking at the time of his evaluation. *Id.* at 1770.

### v. Functional Evaluation: Lee Berk

Dr. Berk completed a functional evaluation of Mr. Briody in May of 2016. Dr. Berk identified certain limitations displayed by Plaintiff, including that Plaintiff could lift and carry less than ten (1) pounds frequently, stand or walk for less than two (2) hours a day, and sit for less than six (6) hours a day. R. at 1173-75. Further, Dr. Berk opined that Plaintiff must periodically alternate between sitting and standing, that he demonstrated limitations in his ability to push, pull, reach, handle, finger, feel, hear, and see color, and that he struggled to climb, balance, stoop, kneel, crouch, or crawl. *Id.* Moreover, Dr. Berk stated that Plaintiff should avoid the following: extreme temperatures, vibration, heavy machinery, heights, wetness, humidity, noise, fumes, odors, and gases. *Id.* at 1126.

### vi. Functional Evaluation: Albert Panozzo

In July of 2017, Dr. Panozzo evaluated Plaintiff noting limitations in Mr. Briody's ability to lift and carry, push and pull, and handle things with his hands. R. at 1441, 1443-44. Further, Dr. Panozzo indicated that Mr. Briody should avoid exposure to fumes, odors, dusts, and gases. *Id.*

### vii. Dr. Alexis Boro[3]

In 2016, Dr. Boro saw Mr. Briody in relation to his epilepsy. R. at 1701-33. Dr. Boro filled out a residual functional capacity questionnaire, which was sent to Dr. Berk. *Id.* at 1701. Dr. Boro noted that Mr. Briody had not had a generalized seizure since 2007, and that he experiences an average of zero (0) seizures a week. *Id.* Dr. Boro had limited information to draw from due to the lack of any recent data points, and he noted as much in the questionnaire. *Id.* at 1701-05.

### viii. Vocational Expert: Donald Silve

At Mr. Briody's hearing, Donald Silve testified as a Vocational Expert. The ALJ asked Mr. Silve to "classify" Mr. Briody's past employment and then to describe the capabilities of hypothetical people with limitations similar to those allegedly exhibited by Mr. Briody. R. at 147. Mr. Silve testified that a person capable of light work in a low stress environment with certain physical restrictions tailored to take into account conditions similar to those alleged by Plaintiff could work as an assembler of small products, a wire worker, a subassembler, a final assembler, a preparer, or a stone setter. *Id.* at 148-51. Mr. Silve testified that none of those jobs required any interaction with the general public. *Id.*

Mr. Silve further testified that if the same hypothetical individual is going to be off task for twenty percent of the work period outside of regularly scheduled breaks, that would preclude all employment. R. at 151. Additionally, if the same hypothetical person was limited to four

---

[3] The Parties dispute whether Dr. Boro's evaluation is a medical opinion. Def's Reply Supp. Mot. at 3-4; Pl. Opp at 11-12.

hours of sitting and one hour of standing or walking, that would preclude all full-time employment. *Id.* at 152.

## STANDARD OF REVIEW

### I. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted). Thus, if a court finds a determination to be supported by substantial evidence, it "must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

## II.   Commissioner's Determination of Disability

### a.  Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) *accord* 42 U.S.C. § 1382c(a)(3)(A); *see* R. at 10. Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)). In cases such as this, where there is medical evidence of substance use disorders, there is an additional issue as to whether a claimant's substance use was a "contributing factor material to the determination that she was disabled." *Smith v. Comm'r of Soc. Sec. Admin.*, 731 Fed. Appx. 28, 29 (2d Cir. 2018) (citing 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)).

### b.  The Commissioner's Five-Step Analysis of Disability Claims

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. *Selian,* 708 F.3d at 417; *see* 20 C.F.R. §§ 404.1520.

> "First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers from such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment

> which is listed in Appendix 1 of the regulations. If the claimant has such an
> impairment, the Commissioner will consider him [per se] disabled ...
> Assuming the claimant does not have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe impairment, he has the residual
> functional capacity to perform his past work. Finally, if the claimant is
> unable to perform his past work, the Commissioner then determines
> whether there is other work which the claimant could perform."

*Selian*, 708 F.3d at 417-18 (citing *Talavera*, 697 F.3d at 151; 20 C.F.R. § 404.1520).

"The claimant has the general burden of proving that he or she has a disability within the

meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'"

*Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five,

however, "the burden shifts to the Commissioner to show that there [are] a significant number of

jobs in the national economy that [the claimant] could perform based on his residual functional

capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381

(2d Cir. 2004) (citing 20 C.F.R. § 404.1560); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5

(1987).

### c. The Decision of the Administrative Law Judge

As stated, on October 25, 2017, the ALJ issued a written decision following Mr. Briody's

November 1, 2016 hearing. R. at 23. The ALJ determined that Plaintiff met the insured status

requirements of the SSA through March 31, 2012. *Id.* at 12. Plaintiff had not engaged in

substantial gainful activity since December 1, 2010. *Id.* at 13.

The ALJ found that Mr. Briody suffered from the following "severe" impairments:

degenerative disc disease of the lumbar spine and cervical spine; seizure disorder; hepatitis C;

hand and wrist arthritis; hemochromatosis; anxiety; depression; personality disorder; cocaine

dependence and alcohol dependence. R. at 13. The identified impartments met section 12.04 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)). *Id.*

In relation to substance abuse, even if Plaintiff ceased substance abused, he would "continue to have a severe impairment or combination of impairments" that would impact his ability to perform basic work activities. R. at 14. However, if substance abuse was no longer an issue, Plaintiff would not present an impairment or combination of impairments that medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404,1520(d) and 416.920(d)). *Id.*

The ALJ determined that if Mr. Briody stopped abusing substances, he would display the functional capacity to perform "light work" and simple routine tasks requiring minimal exertions of physical strength. *See* 20 CFR 404.1567(b) and 416.967(b); R. at 16-17. However, even free from substance abuse issues, Plaintiff would still be required to avoid extreme temperatures, humidity, unprotected heights, and hazardous machinery. *Id.* His impairments, however, would restrict him from performing past relevant work, even if he stopped the substance abuse. *Id.* at 21. Even so, the ALJ found that if Plaintiff ceased the abuse of drugs and alcohol, "considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform." *Id.* at 22.

In conclusion, the ALJ determined that Mr. Briody's substance abuse was "a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use." R. at 23. Because of the materiality of the substance abuse, the ALJ found that Mr. Briody was not disabled within the meaning of the SSA "at any time from the alleged onset date through the date of this decision." *Id.*

## DISCUSSION

Mr. Briody asserts that Defendant improperly arrived at the conclusion that Plaintiff's substance abuse precluded a determination that Plaintiff was disabled for four reasons. First, Mr. Briody claims that the ALJ improperly balanced the opinions of treating physicians and consulting physicians. Second, Plaintiff alleges that the ALJ improperly concluded that he was not disabled when he was sober. Third, Mr. Briody argues that the ALJ did not properly develop the record. Fourth and finally, Plaintiff posits that the RFC determination was not supported by substantial evidence.

The Court addresses each contention in turn and holds that the ALJ decision was supported by substantial evidence and not legally erroneous.

## I. The ALJ Properly Balanced the Opinions of Treating Physicians and Consulting Physicians

Mr. Briody alleges that the ALJ relied too heavily on the consultive opinion of Dr. Strausner in coming to the determination that Mr. Briody's substance use was a contributing factor material to the initial determination on disability status. Pl. Mem. Opp. Mot. & Mem. Supp. Cross-Mot. at 8-9. Plaintiff claims that Defendant "failed to follow the "treating physician rule," by not giving enough weight to the opinions" of Dr. Berk, Dr. Panozzo, Dr. Hameedi, Dr. Choko[4], and Dr. Boro. *Id.* at 9.

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician … the opinion of the treating physician is not afforded controlling weight where … the treating physician issued opinions that are not consistent with

---

[4] Plaintiff provides no argument as to why the ALJ erred in considering the opinions of Dr. Choko. *See* Pl. Opp at 8-12.

other substantial evidence in the record ..." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). If an ALJ determines that a medical opinion is not entitled to controlling weight, "it must determine how much weight, if any, to give it," by way of considering the nonexclusive *Burgess* factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). The ALJ must "explicitly consider" and "give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." *Id.* Even in the absence of the explicit application of the *Burgess* factors, if "a searching review of the record assures [a court] that the substance of the treating physician rule was not traversed," an ALJ's determination will be affirmed. *Estrella*, 925 F.3d at 96 (citing *Halloran*, 362 F.3d at 32).

In addressing the evidence in the record, the ALJ expressly indicated that "there are several reasons why the claimant's allegations of the nature, intensity, persistence, [and] limiting effects of those symptoms are not consistent with the medical signs, laboratory findings," or other evidence in the record. R. at 19. First, the ALJ pointed to Mr. Briody's described daily activities "which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.* As his testimony indicated, he is able to go to the store, perform light cleaning including vacuuming and laundry, as well as take public transportation. *Id.* Further, he goes to the movies and has gone apple picking with his girlfriend. *Id.* Second, the ALJ considered the "conservative nature" of Mr. Briody's treatment for his allegedly disabling

impairments. *Id.* Physical examinations conducted from 2014-2016 "showed a normal gait, normal balance, full range of motion of his cervical spine, negative straight leg raising tests and normal reflexes." *Id.* Regarding his mental impairments, most of the treatment related to his polysubstance abuse rather than the depression and social anxiety alleged. *Id.* The ALJ emphasized the success of the substance abuse treatment on reducing his symptoms, pointing to statements by Mr. Briody indicating that his "mood was much better" when he took antidepressants. *Id.* Notes on Mr. Briody's mental status during periods of sobriety describe him as alert, oriented, and cooperative with intact memory and a regular attention span and concentration. *Id.* Third, the ALJ considered the sporadic nature of Plaintiff's employment prior to the alleged onset of his disability and questioned Mr. Briody's reasons for lack of employment. *Id.* at 19-20.

More specifically, with the exception of the opinion of Dr. Boro[5], the ALJ specifically addressed the weight afforded each medical examiner and the reasons for assigning that weight to their respective opinions. R. at 17-21.

The ALJ reviewed Dr. Panozzo's July 2016 evaluation of Mr. Briody's hand and wrist. R. at 20. Dr. Panozzo indicated that Plaintiff's arthritis mandated that he carry and lift less than

---

[5] "A medical opinion must reflect a judgment with regard to the nature and severity of plaintiff's limitations beyond a mere diagnosis and description of symptoms" *Baily v. Berryhill*, 2017 WL 1102671, at *2 (S.D.N.Y. Mar. 24, 2017) (quoting *Merriman v. Comm'r of Soc. Sec.*, 2015 WL 5472934, at *20 (S.D.N.Y. Sept. 17, 2015)) (internal quotations omitted). Dr. Boro's statement simply states Mr. Briody's history of seizures – no more, no less. *See* R. at 1701-05. Therefore, because it does not "reflect judgments about the nature and severity of [the] impairment(s), including … symptoms, diagnosis and prognosis," and what limitations a patient faces, Dr. Boro's statement is not a medical opinion. *See Bailey*, 2017 WL 1102671, at *2 (citing 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2)). Even if Dr. Boro's assessment is a medical opinion, the only reason Plaintiff gives demonstrating how the ALJ's determination is contrary to Dr. Boro's findings on Plaintiff's epilepsy and seizures is the lack of mention of Dr. Boro's statement that "[a]ddressing [Plaintiff's] chronic pain conservatively may improve [his] quality of life] and … [his] likelihood of abstinence" – a prime example of a statement that does not constitute a medical opinion due to its lack of support in the report. *See Id.*

ten (10) pounds and he has limited ability to manipulate, finger, feel and handle items. *Id.* In considering this evaluation, the ALJ stated that "the record contains scant progress notes from him documenting significant clinical findings that might serve as the basis for the profound limitations he opines and the record as a whole does not support the levels of limitations that he assessed." *Id.* The ALJ looked to the "normal" nature of Mr. Briody's examinations as well as the "full strength" review assigned to Mr. Briody's upper extremities at the consultive examination. *Id.* Due to the inconsistencies and lack of progress notes, the ALJ concluded that Dr. Panozzo's opinion was not entitled to controlling weight. *Id.*

Turning to Dr. Berk's medical source statement, the ALJ gave little weight to the review because "it appear[ed] that Dr. Berk relied heavily on the claimant's subjective complaints ... which are not entirely supported by the objective evidence of record showing largely normal examination with conservative treatment." R. at 20; *see Morgan v. Berryhill*, 2017 WL 6031918, at *4 (W.D.N.Y. Dec. 5, 2017) (citing *Roma v. Astrue*, 468 Fed.Appx. 16, 19 (2d Cir. 2012)) ("[T]he supportability of Dr. Prywes's opinion was doubtful as it was based largely upon Roma's subjective responses, which were not themselves entirely credible ..."). The extensive findings showing "normal examinations" with relatively "conservative treatment," including demonstrations of a normal gait, normal balance, full range of motion in his cervical spine, negative straight leg raising tests, normal reflexes, hand and finger dexterity, full grip strength, no sensory loss, and full strength overall in the upper and lower extremities, were inconsistent with the "extreme limitations" indicated by Dr. Berk. *Id.* As such, the ALJ afforded little weight to Dr. Berk's evaluation. *Id.*

The ALJ came to the same conclusion regarding Dr. Hameedi's various reports. R. at 20. While Dr. Hameedi determined in 2015 that Mr. Briody would be absent about three days per week from work and would be very limited in his interactions with others, and in 2017 that Mr. Briody was not presently able to work, the ALJ concluded that those evaluations did not consider Mr. Briody during times of sobriety.[6] *Id.* Thus, the ALJ refrained from giving Dr. Hameedi's evaluations controlling weight. *Id.*

The ALJ did give substantial weight to the opinions of Dr. Straussner, Dr. Antiaris, and Dr. Kaci. R. at 21. The ALJ stated that Dr. Straussner's opinion was supported by the record, "which shows that the claimant's mental health impairments do not cause more than moderate limitations during periods of sobriety." *Id.* The ALJ stated that Dr. Antiaris was supported in finding that "the claimant has no more than mild limitations engaging in tasks and learning new tasks," the ALJ disputed Dr. Antiaris's findings that Mr. Briody has "marked limitations in making decisions while sober." *Id.* The ALJ found that there was no evidence to support the latter of those two findings, specifically noting that the ALJ evaluated Mr. Briody during an extended period of substance abuse. *Id.* The ALJ also gave Dr. Kaci's opinion "some" weight and agreed with her assessment that Plaintiff was not precluded from all work-related activity. *Id.* However, the ALJ found that Dr. Kaci's conclusions and examinations were not necessarily consistent. *Id.*

> "Dr. Kaci's conclusions, together with his examination showing normal
> gait, full strength in the upper and lower extremities, no loss of sensory, full
> range of motion of his cervical spine and negative straight leg raising tests

---

[6] Plaintiff suggests his two Global Assessment of Functioning ("GAF") exams, in which he obtained the exact same score when sober and during periods of substance use, indicate that his disabilities are not substance dependent. Pl. Opp. at 13. However, the ALJ considered the GAF scores and determined that they carried "limited evidentiary value" because they "reveal only snapshots of impaired and improved behavior." R. at 21. The ALJ gave more weight to the treatment record that "demonstrate[d] the claimant's good response to medications." *Id.*

> support a finding that the claimant's ability to stand and walk are not
> significantly limited and the claimant can engage in a range of light work
> consistent with the above residual functional capacity."

*Id.*

In sum, while the ALJ did not specifically enumerate the Burgess factors in explaining

the weight afforded each medical opinion, he "explicitly consider[ed]" and gave "good reasons"

in his decision for the weight he gave the treating source's medical opinions. *See Estrella*, 925

F.2d at 95-96. The ALJ identified multiple inconsistencies between the medical evidence, the

testimony, and Mr. Briody's periods of sobriety and substance use. R. at 20-21. Upon review,

this Court cannot say that the ALJs determination that the opinions of some treating physicians

were inconsistent with the record is not supported by substantial evidence. *See Halloran*, 362

F.3d at 32; *Seilan*, 708 F.3d at 417.

## II.    The ALJ Properly Concluded that Mr. Briody was Not Disabled when Sober

Plaintiff alleges that, when sober, his symptoms "did not improve to the extent necessary

to eliminate his disability," thus the ALJ improperly concluded that if Mr. Briody eliminated

substance use he "would not have an impairment or combination of impairments that meets or

medically equals any of the impairments" required to sustain a disability claim. Pl. Opp. at 12; R.

at 14. Plaintiff cites to the testimony of Mr. Briody's brother[7], as well as Mr. Briody's two

Global Assessment of Functioning exams to support his challenge. Pl. Opp. at 13.

In coming to the conclusion that Mr. Briody would not be disabled if he discontinued the

substance abuse, the ALJ determined that Mr. Broidy's hepatitis C did not constitute chronic

---

[7] The ALJ determined that, while helpful, the testimony of Mr. Briody's brother is not supported by medical
findings and is therefore of limited probative value. R. at 21.

liver disease, that his joint pain did not satisfy the requirements for major dysfunction of a joint, that his back pain did not qualify as a disorder of the spine, and determined that there was no indication that his epileptic seizures interfered with Mr. Briody's activity during the day. R. at 14-15. Further, the ALJ reasoned that, if Mr. Briody ceased his abuse of substances, he would have moderate limitations in "understanding, remembering, or applying information," interacting with others, and "concentrating, persisting, or maintaining pace." *Id.* at 15-16. Minus substance abuse, the ALJ also determined that Mr. Briody would have mild limitations in managing or adapting himself. *Id.* at 16. The limitations identified "would not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation" if Plaintiff ceased his substance use. *Id.* Finally, the ALJ stated that the "record does not establish that the claimant would have only marginal adjustment" to daily life. *Id.* The ALJ found support for his determination in a multitude of medical documents included in the record. *Id.* at 16-21.

The ALJ did not say that Plaintiff's cessation from substance use would rid him of all pain and ailments. To the contrary, the ALJ specifically stated that, even without substance use, Plaintiff would be unable to perform his past work. R. at 21. Going one step further, the ALJ stated that Mr. Briody would not have the residual functional capacity to perform the full range of light work. *Id.* at 22. Rather, in accordance with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, and after considering the testimony of a vocational expert, the ALJ concluded that, if Mr. Briody "stopped the substance use, he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy." *Id.* at 32. Thus, the combination of mild to moderate limitations displayed by Mr. Briody while sober

paired with the availability of work led the ALJ to his final finding that Mr. Briody was not

disabled. *Id.*

## III.    The ALJ Properly Developed the Record

Plaintiff claims that the ALJ did not properly develop the record by "failing to adequately

investigate the impact of Plaintiff's deteriorating physical conditions on his ability to effectively

manage pain in the workplace and his daily life." Pl. Opp. at 14. In essence, although he points to

no specific documents that would address his concern, Plaintiff argues that there is insufficient

evidence in the record exploring the relationship between Plaintiff's pain and his substance use.

*Id.*

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77

F.3d 41, 47 (2d Cir. 1996). The record must be "complete and detailed enough to allow the ALJ

to determine the claimant's residual functional capacity." *Roman v. Colvin*, No.

15CIV4800LGSJCF, 2016 WL 4990260, at *7 (S.D.N.Y. Aug. 2, 2016), *report and

recommendation adopted*, No. 15CIV4800LGSJCF, 2016 WL 4919960 (S.D.N.Y. Sept. 14,

2016) (citing 20 C.F.R. § 416.913(e)) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL

374184, at *5 (July 2, 1996)). Though an ALJ must make reasonable efforts to aid an applicant

in retrieving medical reports from her medical sources, and to collect any other necessary

evidence, *Villarreal v. Colvin*, No. 13 Civ. 6253, 2015 WL 6759503, at *17 (S.D.N.Y. Nov. 5,

2015) (quoting 20 C.F.R. § 416.913(e)), "an ALJ is not required to attempt to obtain additional

evidence to fill any gap in the medical evidence; rather an ALJ is required to do so only where

the facts of the particular case suggest that further development is necessary to evaluate the

claimant's condition fairly." *Francisco v. Commissioner of Social Security*, No. 13 Civ. 1486,

2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521

F. App'x 29, 32 (2d Cir.2013)); *see McMahon v. Colvin*, 2017 WL 8948743, at *25 (S.D.N.Y.

Aug. 18, 2017). Where a case has "a voluminous medical record assembled by the claimant's

counsel that was adequate to permit an informed finding by the ALJ . . . it would be

inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in

assessing residual functional capacity." *Roman*, 2016 WL 4990260, at *7 (citing *Tankisi*, 521

Fed. Appx. at 34).

Here, the ALJ properly developed the record. The ALJ considered over 1,300 pages of

medical records in this case. *See* R. The ALJ conducted an extensive in person Hearing with Mr.

Briody, who was represented by counsel, and asked if there were any other doctors or

professionals who treated or diagnosed him that could contribute additional medical records. *Id.*

at 76. There were no "obvious holes" in Plaintiff's medical record, and as such, it was not

necessary for Defendants to seek additional information. *See Estrella o/b/o M.R.E. v. Berryhill*,

2017 WL 2693722, at *20 (S.D.N.Y. June 22, 2017). The ALJ reviewed the extensive medical

records pertaining to Mr. Briody's detoxification treatment and analyzed mental and physical

health treatment both before and after substance use treatment. R. at 19. Further, the ALJ

considered the success of the detoxification and "polysubstance" treatment, and the lessening of

his mental health issues following such treatment. *Id.* The ALJ considered evidence that Plaintiff

did not take pain medication due to his addictive personality, nor did Plaintiff attend physical

therapy although it was suggested by treating physicians. *Id.* at 113-14.

The ALJ considered adequate medical evidence to permit an informed finding, and thus, the ALJ fully satisfied his duty to develop the record. *See Roman*, 2016 WL 4990269, at *7.

## IV. The Residual Functional Capacity Determination was Supported by Substantial Evidence

Aside from the arguments addressed above, Plaintiff provides no support for the claim that substantial evidence does not support the RFC determination. Pl. Opp. at 15-16. As discussed, the ALJ reviewed over 1,300 pages of medical records, conducted an extensive in-person interview with Mr. Briody, consulted multiple doctors and medical consultants, conducted and evaluated tests, and thoroughly addressed each of Plaintiff's symptoms. *See* R. The RFC determination was supported by substantial evidence.

CONCLUSION

For the aforementioned reasons, Plaintiff's Motion for Judgment on the Pleadings is hereby **DENIED**, and Defendant's Motion for Judgment on the Pleadings is hereby **GRANTED**.

**SO ORDERED.**

Dated: September 30, 2019
      New York, New York

                    **ANDREW L. CARTER, JR.**
                    **United States District Judge**